IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 2:10-CR-273-DCN |
| vs. | ) | |
| | ) | |
| ORDELL GILLIARD, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on defendant's motion to suppress. Defendant argues that various quantities of drugs seized following his arrest should be suppressed because the arrest warrants for defendant were defective, and the protective sweep and search conducted by officers were unreasonable and did not fall under any recognized exceptions to the search warrant requirement. The government filed a response in opposition, asserting that the arrest warrants in question were supported by probable cause and timely executed. In addition, the government asserts that the protective sweep conducted by officers was reasonable under controlling law. A suppression hearing was held on July 7, 2010. For the reasons set forth below, the court denies defendant's motion.

## I. BACKGROUND

On July 17, 2008, Charleston County Sheriff's Office (CCSO) detectives directed a confidential informant (CI) to conduct a controlled purchase of crack cocaine from a suspect known as "T.J." and "Tony." After several phone calls between the CI and Tony, Tony agreed to meet the CI at a parking lot on Folly Road, so that the CI could purchase

1

one gram of crack cocaine for $100. At approximately 7:33 p.m., a light-colored "GMC Suburban" occupied by two black males pulled into the parking lot. A CCSO incident report, submitted as defendant's exhibit #5 during the suppression hearing, reflects that the "GMC Suburban" had South Carolina license tag 6350DP.[1] The passenger, later identified as Anthony A. Deas ("Tony"), got out of the sport utility vehicle (SUV). As Deas walked to meet the CI, he called the CI from his cell phone. Meanwhile, the driver of the SUV pulled into a parking space right next to Detective Philip Foster's surveillance position. According to Detective Foster's testimony, the "Suburban" was positioned so that the driver, whom he later identified as defendant, could monitor the transaction between the CI and Deas. Following the exchange of money for drugs between the CI and Deas, Deas got back into the front passenger side and left the door open. Detective Foster observed Deas sharing the proceeds of the drug sale with defendant. Deas then closed the door, and the "Suburban" left the incident location. The crack cocaine purchased by the CI field-tested positive for cocaine.

Almost nine months later, on April 9, 2009, detectives obtained arrest warrants for defendant, signed by South Carolina Magistrate Mary B. Holmes. The arrest warrants, supported by affidavits and sworn testimony, charged defendant with conspiracy to distribute crack cocaine and conspiracy to distribute crack cocaine within a one-half mile proximity of a school.

---

[1] What was described as a GMC Suburban turned out to be a GMC Yukon, but the license plate on the vehicle involved in the July 17, 2008 drug sale matched that of a GMC Yukon driven exclusively by defendant and registered to his mother.

On June 3, 2009, members of the CCSO Metro Narcotics Unit traveled to 1837 Sallie Street, on James Island, South Carolina, to serve the arrest warrants. The officers knocked on the front door of the residence, but no one answered. The officers then went to the rear of the residence, where they found a gazebo. The gazebo was dark, and the windows were covered in condensation, so the officers could not see anything inside the gazebo. According to defendant's brief, this is not a gazebo in the traditional sense, with side openings or glass walls. The gazebo at the residence is "essentially an extension of the primary residence, has ordinary windows and is connected to the residence by a wooden deck. The total distance between the primary residence and the gazebo is 297 inches, which is approximately 8 yards." Mot. to Suppress 4.

Staff Sergeant Donald Cooley, assigned to the CCSO Metro Narcotics Unit, testified that he and Detective Tom Costanzo identified themselves as law enforcement officers through the glass door of the gazebo. When defendant appeared at the door, officers ordered him to open the door. According to Staff Sergeant Cooley, defendant initially refused, but after multiple requests, he opened the door, and the officers attempted to arrest him. Staff Sergeant Cooley testified that defendant, who is six feet three inches tall and weighs over three hundred pounds, then struggled with the two officers.[2] During the course of the struggle, two other officers testified that they entered the darkened gazebo to perform a protective sweep, to ensure that no other individuals were inside. The officers saw a bar located approximately eight feet from defendant.

---

[2]In contrast, defendant testified that he did not resist arrest and struggle with the officers.

Upon looking behind the bar, the officers saw clear plastic bags containing an off-white rock-like substance they believed to be crack cocaine in plain view on top of an electronics component box and in an ice bucket. The officers also observed United States currency in the ice bucket. Sergeant Donald Stanley testified that even after he and Detective Matthew Euper concluded the protective sweep and exited the gazebo, Staff Sergeant Cooley, Detective Costanzo, and other officers were still struggling to secure defendant.

While defendant was being transported to the Charleston County Detention Center, the officers secured the gazebo so they could obtain a search warrant for the gazebo and the main residence. While the officers were waiting for the search warrant, the owner of the residence and mother of defendant, Zelda McCoy, arrived and gave officers consent to search the residence. The officers informed Ms. McCoy that they were in the process of obtaining a search warrant. Once they had the warrant in hand, they conducted a search of the gazebo and residence. The officers located "a variety of drugs, United States currency, and drug-related evidence in the gazebo and a bedroom associated with the defendant." Resp. in Opp'n 4. At the suppression hearing, defendant admitted that he had cocaine, crack cocaine, marijuana, and Ecstasy in the ice bucket in the gazebo, but he alleged that the ice bucket containing the drugs and currency was a closed container. The officers also seized a silver GMC Yukon, South Carolina license tag 6350DP, parked in the driveway of the residence. According to the government, this is the same vehicle used in the July 17, 2008 drug transaction.

On March 9, 2010, a federal grand jury indicted defendant on one count of possession with intent to distribute a quantity of methylenedioxymethamphetamine (MDMA), a quantity of marijuana, five grams or more of crack cocaine, and a quantity of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 841(b)(1)(C), and 841(b)(1)(D). Defendant filed the current motion to suppress on June 14, 2010. Defendant raises numerous arguments regarding his arrest and the evidence seized from the gazebo. Defendant claims that the arrest warrants issued by the South Carolina magistrate were not supported by probable cause; therefore, all evidence obtained as a result of the arrest and subsequent searches should be suppressed. Defendant claims that the probable cause used in support of the warrants was stale, and the delay in obtaining and serving the warrants violates his right to a speedy trial. Defendant argues that the protective sweep conducted by the officers was unwarranted and unreasonable, in violation of the Fourth Amendment. Defendant argues that the search of the gazebo was not valid as a search incident to an arrest, and, finally, he argues that the evidence seized was not in plain view.

In its response, the government counters defendant's arguments by asserting that the arrest warrants were supported by probable cause and timely executed. The government asserts that the protective sweep complied with the standards set forth in <u>Maryland v. Buie</u>, 494 U.S. 325 (1990), and alternatively, the search of the gazebo was valid as a search incident to arrest. As a second alternative, the government states that the evidence would have been inevitably discovered following Ms. McCoy's offer of consent to search the residence. Lastly, the government claims that it was appropriate to seize

drug evidence in plain view in the gazebo.

On July 7, 2010, this court held a suppression hearing. Four witnesses, all officers who participated in the execution of the arrest warrants, testified on behalf of the government, and two witnesses, including defendant, testified for the defense. The government submitted photographs of seized drugs and contraband as exhibits, and defendant submitted various documents, including a CCSO investigation report, as exhibits during the hearing.

## II. DISCUSSION

The first issue is whether the arrest warrants signed by South Carolina Magistrate Mary B. Holmes were supported by probable cause. The Fourth Amendment to the United States Constitution states that

> [t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. "[A] neutral and detached magistrate, and not the police, should determine whether there is probable cause to support the issuance of a warrant." Illinois v. Gates, 462 U.S. 213, 275 (1983). "In order to emphasize the magistrate's role as an independent arbiter of probable cause and to insure that searches or seizures are not effected on less than probable cause, the Court has insisted that police officers provide magistrates with the underlying facts and circumstances that support the officers' conclusions." Id. at 276. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of

the bare conclusions of others." Id. at 239. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Id. at 245 n.13. In addition,

> The Fourth Amendment does not require that the basis for probable cause be established in a written affidavit; it merely requires that the information provided the issuing magistrate be supported by "Oath or affirmation." U.S. Const. amend. IV. Moreover, the Amendment does not "require that statements made under oath in support of probable cause be tape-recorded or otherwise placed on the record or made part of the affidavit." United States v. Shields, 978 F.2d 943, 946 (6th Cir. 1992).

United States v. Clyburn, 24 F.3d 613, 617 (4th Cir. 1994). It is also important to recognize that "magistrates' determinations of probable cause 'should be paid great deference by reviewing courts . . . .'" Gates, 462 U.S. at 288 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)).

The arrest warrants for defendant charged him with Conspiracy to Distribute Crack Cocaine, in violation of South Carolina Code of Laws § 44-53-375, and Conspiracy to Distribute Crack Cocaine within ½ Mile Proximity of a School, in violation of § 44-35-445.

> A conspiracy is a combination or agreement between two or more persons for the purpose of accomplishing a criminal or unlawful object, or achieving by criminal or unlawful means an object that is neither criminal nor unlawful. State v. Wilson, 315 S.C. 298, 433 S.E.2d 864 (1993). The essence of a conspiracy is the agreement. Id. It may be proven by the specific overt acts done in furtherance of the conspiracy but the crime is the agreement. Id. To establish the existence of a conspiracy, proof of an express agreement is not necessary, and direct evidence is not essential, but the conspiracy may be sufficiently shown by circumstantial evidence and the conduct of the parties.

State v. Buckmon, 555 S.E.2d 402, 405 (S.C. 2001). South Carolina law prohibits individuals from conspiring to "manufacture, distribute, dispense, deliver, or purchase, or

possess with intent to distribute, dispense or deliver . . . cocaine base." S.C. Code Ann. § 44-53-375(B).

Defendant focuses on the contents of the affidavits supporting the arrest warrants. The affidavits simply state that defendant conspired with Deas to distribute crack cocaine by driving Deas to and from the transaction. While not in his brief, defendant testified at the suppression hearing that nobody drove his car but him. He testified that he drove Deas to a softball game on one occasion, but he never drove Deas to a drug deal. Defendant also testified that he did not drive Deas anywhere on July 17, 2008, because he was playing football for Benedict College at that time. Defendant offered no other evidence to support his alibi.

Defendant argues that he did not participate in the transaction, and officers did not present evidence to the magistrate demonstrating that defendant conspired with Deas. Defendant also implies that the information contained in the affidavits were "mere conclusory statements" and failed to show the essence of the conspiracy, an agreement between defendant and Deas. Mot. to Suppress 5-6.

At the suppression hearing, Detective Philip Foster testified that when he presented the affidavits and warrants to the magistrate, he was placed under oath. The magistrate asked Detective Foster to tell her about the case, at which time he read the incident report to her. Detective Foster told the magistrate that after a series of phone calls setting up a drug transaction between the CI and Deas, defendant and Deas arrived in a vehicle driven by defendant, that Deas got out of the vehicle to sell the drugs to the CI, and that when Deas returned to the vehicle, he entered the passenger side front seat

and divided the currency from the drug transaction with defendant. Detective Foster testified that he was able to observe this event because he was in a vehicle parked immediately to the right of defendant's vehicle. In fact, Detective Foster testified that during his surveillance, the two vehicles were so close together that the passenger door of defendant's vehicle hit Detective Foster's side mirror when Deas opened it.

The court finds that the information in the arrest warrant affidavits, combined with the detective's oral explanation of the case, including observations made during the transaction, satisfy the probable cause standard set forth in Clyburn. The detective's oral statements were made under oath. Considering all of the information provided to the magistrate, the government has produced sufficient evidence that there was a "substantial chance" defendant conspired to deliver crack cocaine. Gates, 462 U.S. at 245 n.13. Therefore, giving the necessary great deference to the magistrate's determination, the arrest warrants were supported by probable cause.

The second and third issues are whether the probable cause used to obtain the arrest warrants was stale, and whether the officers' delay in executing the warrants violated defendant's right to a speedy trial. In United States v. Watson, the Supreme Court briefly discussed the issue of stale probable cause as it relates to arrest warrants:

> The probable cause to support issuance of an arrest warrant normally would not grow stale as easily as that which supports a warrant to search a particular place for particular objects. This is true because once there is probable cause to believe that someone is a felon the passage of time often will bring new supporting evidence. But in some cases the original grounds supporting the warrant could be disproved by subsequent investigation that at the same time turns up wholly new evidence supporting probable cause on a different theory. In those cases the warrant could be stale because based upon discredited information.

423 U.S. 411, 432 n.5 (1976). In his brief, defendant acknowledges this portion of the Watson opinion and then states that no additional evidence of a drug conspiracy between defendant and Deas was found between the time of the transaction, on July 17, 2008, and execution of the arrest warrant affidavit on April 9, 2009. Defendant claims that this lack of additional evidence supports his argument that defendant did not drive Deas to the transaction location, and he claims that officers used the execution of the arrest warrant as "a mechanism to search his residence." Mot. to Suppress 7.

Despite the fact that the arrest warrants issued approximately nine months following the drug transaction between the CI and Deas, the government correctly states that defendant has not discredited the information in the affidavits (or Detective Foster's sworn oral statements to the magistrate) used to establish probable cause. The fact that no additional information was developed by the officers between the time of the drug transaction and the issuance of the arrest warrants is irrelevant, and the assertion that the officers used the arrest warrants as a means to search defendant's residence is unsupported by any other facts or evidence.[3] Defendant has failed to show that the probable cause in the arrest warrants is stale because it is based on discredited information.

"Police officials are required to use diligence in the execution of arrest warrants." United States v. Weaver, 384 F.2d 879, 880 (4th Cir. 1967). Law enforcement officers

---

[3]Although the officers obtained a search warrant for the residence following defendant's arrest, they actually received consent to search the residence from defendant's mother prior to executing the signed search warrant.

"may not hold [an arrest warrant] unexecuted for an unreasonable period of time in the hope that they may ultimately find the defendant in a house or other building which they would like to search, but which they could not lawfully search except as an incident of a lawful arrest." Id. However, "[a]gents are not required to neglect all other investigatory and enforcement activity in order to execute every arrest warrant." Id. at 880-81 (holding that a delay of sixteen days in executing an arrest warrant for a suspect whose address was unknown was not unreasonable on its face).

Hoffa v. United States makes clear that "[t]here is no constitutional right to be arrested." In that case, the Supreme Court held:

> The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

385 U.S. 293, 310 (1966).

Defendant cites United States v. Washington, 504 F.2d 346, 358 (8th Cir. 1974), to support the argument that a "long delay arising from the negligence or laziness of the arresting officers in executing an arrest warrant can be unreasonable, leading to a possible violation of a defendant's right to a speedy trial." Mot. to Suppress 7. Reference to this opinion ignores the fact that Washington involved a post-indictment delay in effecting the arrest of a suspect, and it also ignores Supreme Court and Fourth Circuit precedent regarding *pre-indictment* arrests, such as the one that occurred in the instant case. The "Sixth Amendment right of the accused to a speedy trial has no application beyond the

confines of a formal criminal prosecution." Doggett v. United States, 505 U.S. 647, 655 (1992). In United States v. Marion, 404 U.S. 307, 321 (1971), the Supreme Court declined to extend the reach of the Sixth Amendment "to the period prior to arrest." "The speedy trial right does not apply . . . to pre-indictment delay because that right does not attach until the defendant has been indicted or arrested." Jones v. Angelone, 94 F.3d 900, 906 n.6 (4th Cir. 1996). Accordingly, defendant's argument that the delay in executing the arrest warrants violated his right to a speedy trial is without merit.[4]

The fourth issue raised by defendant is whether the officers' protective sweep of the gazebo was constitutional. In Maryland v. Buie, the Supreme Court held that,

> incident to the arrest . . . officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

494 U.S. 325, 334 (1990). The Court emphasized that the key justification for this in-home intrusion is officer safety. "[T]he arresting officers are permitted in such

---

[4]Detective Euper testified that the CCSO Metro Narcotics Unit used several CIs, including the one involved in the July 17, 2008 transaction, to make drug purchases from multiple drug dealers on James Island. Most of the purchases were completed by March 2009. The Metro Narcotics Unit then obtained and executed a series of arrest warrants. Detective Euper stated that defendant was not arrested immediately following the July 17, 2008 transaction because the Metro Narcotics Unit did not want to compromise the CI at an early stage of the investigation, and the unit sought to obtain further information and evidence on the targets of the investigation. Moreover, the arrest warrants were executed in one community at a time on James Island, to prevent word-of-mouth from affecting the officers' ability to apprehend suspects in tight-knit communities. Aside from the fact that this case involved a pre-indictment arrest, the government presents compelling reasons supporting the delay in obtaining and executing defendant's arrest warrants.

circumstances to take reasonable steps to ensure their safety after, and while making, the arrest. That interest is sufficient to outweigh the intrusion such procedures may entail." Id. The Court compared protective sweeps with Terry[5] frisks and stated that in contrast to a Terry frisk, a protective sweep occurs during the "serious step of taking a person into custody." Id. at 333. The Court added, "[U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Id.

Defendant asks the court to analyze this issue by determining whether the protective sweep was unreasonable under the Fourth Amendment. Defendant states that the court must determine whether defendant had a legitimate expectation of privacy in the gazebo, whether the gazebo was located on the curtilage of the residence, and if the court answers yes to both questions, then the court must determine whether the protective sweep of the gazebo was constitutional. Defendant then argues that the protective sweep was unconstitutional because protective sweeps "are constitutional *only* when officers have reasonable suspicion to believe that the premises to be searched pose a risk to officer safety." Mot. to Suppress 11 (emphasis in original). "Thus, where law enforcement officers lack objective data indicating either that the home contains hazards (i.e., firearms) or that someone other than the defendant is present within the home, they are *not* justified in performing a protective sweep of the home." Mot. to Suppress 12. As a final argument on this issue, defendant argues that there were no places of concealment

---

[5]Terry v. Ohio, 392 U.S. 1 (1968).

within the gazebo; therefore, a protective sweep was unwarranted and unconstitutional.

Defendant relies heavily on a recent decision by the Honorable P. Michael Duffy in United States v. McCants, 664 F. Supp. 2d 620 (D.S.C. 2009). In McCants, officers responded to a domestic violence call. Following a series of events, and once the officers had McCants in custody in his front yard, the officers entered McCants's trailer and found several guns in plain view. A federal grand jury then indicted him for being a felon in possession of five firearms. McCants moved to suppress the firearms, arguing that they were seized in violation of his Fourth Amendment rights. The government asserted that the firearms were lawfully seized pursuant to a lawful arrest, or in the alternative, pursuant to a lawful protective sweep. Addressing the protective sweep argument, Judge Duffy held that the interior of the trailer was not immediately adjoining the place of McCants's arrest in the front yard. Judge Duffy also found that the officers "lacked articulable facts and inferences from which a reasonable officer would have believed that there was someone who posed a danger to the safety of officers waiting inside the trailer." Id. at 625. Therefore, the protective sweep failed both prongs of the rule in Buie.

The government contends that the protective sweep at issue satisfied the first prong of the Buie rule. According to the government, defendant was arrested, following a struggle in the doorway to the gazebo, and a bar, approximately four feet tall, was approximately eight feet from both the doorway and defendant, inside the gazebo. The government argues that the officers conducted a protective sweep of the gazebo during the arrest of defendant because the interior of the gazebo, and thus the bar, were immediately adjoining the place of arrest, and the bar could have concealed a threat to the

officers. The government asserts that the protective sweep of the gazebo also satisfied the second prong of the Buie rule. The officers allege that they had a reasonable belief that other individuals posing a threat of harm may be at the arrest location because the officers observed defendant participating in a drug transaction in July 2008. The government argues that the following facts also support the officers' reasonable belief that others posing a threat to the officers could have been lurking at the arrest location: a dark gazebo with fogged up windows; defendant's initial refusal to open the door; his alleged struggle with the officers; and the fact that the arrest warrants were issued for drug-related offenses, the category of offenses in which guns are frequently involved.

The first prong of the Buie rule allows officers to conduct a protective sweep of areas immediately adjoining the place of arrest from which an attack could be launched *without probable cause or reasonable suspicion*.[6] If the officers wish to conduct a protective sweep beyond those places immediately adjoining the place of arrest, the second prong of the Buie rule requires that the officers base their reasonable belief of possible threats on articulable facts.

In his brief, defendant references an audio recording from the state preliminary hearing, in which an officer testified that after defendant came to the gazebo door and opened it, officers pulled him out and placed handcuffs on him. The officer stated that at the same time, officers conducted a protective sweep of the gazebo. At the suppression hearing, defendant testified that there was no struggle, that when he opened the gazebo

---

[6]In his motion, defendant misreads the first prong of Buie as applying to searches incident to arrest, but not protective sweeps. Defendant claims that only the second prong of the Buie rule applies to protective sweeps. This is patently incorrect.

door, an officer pulled him out and immediately threw him to the ground. Defendant stated that another officer immediately went into the gazebo, walked around inside, and came out. When that officer came out of the gazebo, defendant said that the officer called him a name, kicked him, and put a taser close to his face. Defendant then testified that two officers entered the gazebo after he was handcuffed.

On the other hand, Staff Sergeant Cooley testified that officers identified themselves at the gazebo door and requested that defendant exit the gazebo. Defendant initially said "no" and refused to come out. Officers were unable to see inside the gazebo because no lights were on inside, condensation covered the windows, and it was early in the morning. After multiple requests, defendant finally opened the glass door to the gazebo. Staff Sergeant Cooley said that he grabbed defendant's arm, and a struggle ensued. Staff Sergeant Cooley stated that Detective Euper and Sergeant Stanley conducted a protective sweep inside the gazebo at the same time Staff Sergeant Cooley and Detective Costanzo attempted to place handcuffs on defendant. Staff Sergeant Cooley stated that defendant was finally handcuffed within three to four feet from the gazebo door and that it took more than one set of handcuffs to secure defendant due to his size.

Regardless of whether there was a struggle in the gazebo doorway, everyone agrees that defendant was seized in the doorway, and he was handcuffed on the ground near the gazebo door. Accordingly, the first prong of the Buie rule permits the officers to conduct a protective sweep of the interior of the gazebo without probable cause or reasonable suspicion because that area, including the bar, immediately adjoined the place

16

of defendant's arrest and may have harbored other individuals posing a potential threat to the officers.[7] This situation is distinguishable from McCants, in which officers arrested McCants in his front yard, and then entered and conducted a "protective sweep" of the interior of his trailer. Since the court finds the protective sweep constitutional pursuant to the first prong of the Buie rule, it is unnecessary to consider arguments regarding the second prong. In addition, the issues of whether the officers conducted a valid search incident to arrest, or whether the officers would have inevitably discovered the drug evidence because they could have searched the gazebo and residence after defendant's mother gave consent, are rendered moot.

The final issue for the court's consideration is whether the drug evidence located by officers in the gazebo was found in plain view. "Searches and seizures of property in plain view are presumptively reasonable." Kyllo v. United States, 533 U.S. 27, 42 (2001). "'The plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent.'" Green, 599 F.3d at 376 (internal citations omitted).

Defendant argues that bags of crack cocaine and other drugs, $3,000 in cash, and a digital scale seized by officers were all located in a metal ice bucket, covered by a lid, on a shelf behind the bar in the gazebo. Defendant speculates that the officers who entered

---

[7]During the suppression hearing, defendant admitted that upon entering the gazebo, officers would be unable to see if someone were hiding behind the bar. This contradicts his prior assertion that no areas of concealment existed in the gazebo.

the gazebo took drugs and the digital scale out of the ice bucket and placed them at various locations on the shelf behind the bar, where they were later photographed by officers.

Sergeant Stanley testified that during the protective sweep of the gazebo, he observed what he believed to be a bag of crack cocaine on top of some type of electronic box, and he saw what appeared to be drugs and currency in an open ice bucket. Sergeant Stanley testified that these items were located on the shelf behind the bar, not in a closed container, and not on top of the bar itself. The government submitted five photographs at the suppression hearing. The photographs were taken during execution of the search warrant. The photographs show bags of drugs at various locations on the shelf behind the bar. One shows an open metal ice bucket containing plastic baggies and currency, next to another plastic bag containing a white-colored substance. A lid for the ice bucket is not present in any of the photographs, and Sergeant Stanley stated that he did not see any lids during the protective sweep. According to Sergeant Stanley, the protective sweep lasted approximately ten to fifteen seconds, and because it was dark in the room, he and Detective Euper had to use pistol-mounted flashlights to conduct the protective sweep.

The court finds that all three of the plain-view doctrine requirements have been satisfied. As determined above, Sergeant Stanley and Detective Euper were lawfully present in the gazebo, conducting a valid protective sweep. It is undisputed that officers entered the gazebo in the early morning hours, and there were no lights inside the gazebo. Sergeant Stanley and Detective Euper had to use flashlights to look around the gazebo and behind the bar, and the protective sweep lasted only ten to fifteen seconds. There

does not seem to be enough time for the officers to open the ice bucket, dispose of the lid, and spread the drugs and related paraphernalia around so as to satisfy a plain view requirement. The photographs show plastic bags containing suspected crack cocaine, a digital scale, and boxes of plastic baggies at various locations on the shelf behind the bar. None of the photographs show that the ice bucket had a lid, and defendant offers no evidence aside from his testimony about the existence or location of a lid. Accordingly, the officers had a lawful right of access to the items. Finally, Sergeant Stanley, based on his training and experience as a law enforcement officer, believed these items to be drugs and drug-related contraband. The incriminating nature of these items was thus immediately apparent to him and provided the basis for the search warrant that was executed, allowing officers to seize the drugs, currency, and the digital scale.

### III.  CONCLUSION

For the reasons set forth above, the court **DENIES** defendant's motion to suppress.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**August 11, 2010**
**Charleston, South Carolina**